IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SPFM L.P., dba RITTER DENTAL USA | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION No. 5:15-CV-124 |
| MIDMARK CORPORATION | § § § | |
| Defendant. | § § | |

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, SPFM, LP ("SPFM"), files this Motion for Partial Summary Judgment (the "Motion") under Fed. R. Civ. P. 56 and in support hereof respectfully submits the following:[1]

### I.   SUMMARY OF ARGUMENT

1.   SPFM's Motion should be granted because: (i) the trademark registration asserted by Midmark Corporation ("Midmark") for the mark RITTER, U.S. Reg. No. 1,451,997 (the "'997 Registration"), is void because it was filed by a party who did not own the mark on the filing date; (ii) Midmark cannot establish, and is estopped by a 2012 TTAB judgment, that it had secondary meaning in the RITTER mark for dental products at the time SPFM's licensor began using RITTER for dental products; and (iii) Midmark does not own a Texas trademark registration. Therefore, SPFM should be granted summary judgment on each of such counterclaims by Midmark and on SPFM's affirmative defense that the '997 Registration is invalid.

### II.   INTRODUCTION

2.   SPFM sued Midmark for declaratory judgment, *inter alia*, that SPFM's use of the

---

[1] Attached as Exhibit A is a Declaration of Daryl Bailey authenticating exhibits attached to this Motion.

trademark RITTER for dental products does not infringe any right of Midmark. Midmark counterclaimed that SPFM's use of the trademark RITTER for dental products constitutes trademark infringement pursuant to 15 U.S.C. §§ 1114(a) and 1125(a), a violation of Texas Bus. & Com. Code § 16.102, and common law trademark infringement and unfair competition. SPFM was granted leave to amend to add claims that the '997 Registration, should be cancelled because it was fraudulently procured and that Midmark bears civil liability for asserting a fraudulent trademark registration against SPFM.

3.  SPFM seeks summary judgment on each of Midmark's counterclaims[2] and on SPFM's affirmative defense that the '997 Registration is invalid. Regarding the invalidity of the '997 Registration, this motion does not seek disposition of the fraud claims. Instead, this motion demonstrates that the '997 Registration is invalid, simply due to the following undisputed facts: the application for the '997 Registration was filed by a party that was not the owner of the mark on the filing date of the application. Under the trademark regulations, therefore, the application and resulting registration are void.

4.  For this reason, the '997 Registration should be cancelled, and SPFM should be granted summary judgment on Midmark's "Count One" for trademark infringement of RITTER pursuant to 15 U.S.C. § 1114(a) (which sets forth liability for infringement of a registered trademark).

5.  A requisite element for each of Midmark's counterclaims for trademark infringement pursuant to 15 U.S.C. §§ 1114(a) and 1125(a), and common law trademark infringement and unfair competition ("Count One," "Count Two" and "Count Four") is proof that

---

[2] Midmark also asserts a claim for cybersquatting pursuant to 15 U.S.C. § 1125(d) and trademark infringement claims for the mark ULTRACOMFORT, which are not subjects of this motion.

Midmark owns a legally protected trademark. Because Midmark has no evidentiary presumptions of trademark ownership of the RITTER mark for dental products (for which Midmark has no trademark registration), Midmark must prove such rights. As a surname, the mark RITTER is not legally protected unless and until secondary meaning is established in the mark. Secondary meaning is established through evidence – including consumer surveys, length and manner of use, amount and manner of advertising, and volume of sales – which demonstrates that consumers have come to associate the mark with a single source.

6. Notably, when a mark requires proof of secondary meaning to be legally protected, in order to enforce that mark against another party, the secondary meaning must exist *at the time and place that the alleged infringer first began use of that mark*. Based on the undisputed facts in this case, Midmark cannot prove that it possessed secondary meaning in the mark RITTER for dental products in the United States at the time and place SPFM's licensor (through whom SPFM's right to use RITTER derives) first began using RITTER for dental products in the United States.

7. First, Midmark has never used the mark RITTER on dental products in the United States; Midmark uses the mark MIDMARK for its dental products. Second, the alleged "cross-over" sales of Midmark's RITTER-branded medical products (like lights) to certain customers in the dental market occurred after SPFM's licensor's first use. Third, whatever secondary meaning Midmark might be deemed to possess in RITTER for medical products, if any, was finally adjudged in 2012 by the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("USPTO") specifically **not** to extend to dental products, an issue that Midmark contested at that time and is now estopped from relitigating.

8. Because Midmark cannot prove a foundational element of each of its claims, summary judgment should be granted in SPFM's favor on each of Midmark's claims insofar as

they pertain to the mark RITTER.

9. Finally, Midmark's "Count Three" alleges infringement of marks registered in the State of Texas under Texas Bus. & Com. Code § 16.102. Midmark did not allege that it owns a trademark registration of any mark under the Texas state registration system, and the evidence shows that there is no such registration. Count Three must fail as a matter of law.

**II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

**A.    Case Procedural History**

10. SPFM filed its Original Complaint on February 17, 2015. (Dkt. 1). Midmark filed its Answer and Amended Counterclaim on November 20, 2015 (Dkt. 23). SPFM filed a Motion for Leave to File a First Amended Complaint on September 9, 2016 to add claims arising from fraud in the procurement of the '997 Registration (Dkt. 38), which was granted on October 27, 2016 (Dkt. 52).

11. The Court entered a Scheduling Order in this matter on September 9, 2015 (Dkt. 17). On March 14, 2016, the Court entered an Amended Scheduling Order (Dkt. 27), modifying certain deadlines at the joint request of the Parties. On June 8, 2016, the Court entered another Amended Scheduling Order (Dkt. 34), modifying certain deadlines at the joint request of the Parties. The Court's Order of October 27, 2016, set the deadline for dispositive motions as January 31, 2017 (Dkt. 52).

12. The Parties participated in mediation on April 26, 2016.

**B.    Relevant Factual Background**

*i.    Undisputed Facts Establishing the Invalidity of the '997 Registration*

13. Count One of Midmark's counterclaims alleges, in part, trademark infringement based on the '997 Registration. The '997 Registration is invalid and should be cancelled.

4

14. On November 18, 1986, Midmark purchased the RITTER medical products business from Liebel-Flarsheim Company ("Liebel"), a division of Sybron Corporation ("Sybron"). The transaction was set forth in an Agreement of Purchase and Sale between Liebel and Midmark, with Sybron as guaranty of Liebel's obligations. *See* Ex. F—Wells (Vol. 1) 10:12-14:16, 21:11-21; *Id.* at Ex. F-2 and F-3 (the "1986 Purchase Agreement").

15. The 1986 Purchase Agreement provides in Section 1.01(e):

"Seller [Liebel] hereby sells, conveys, transfers, assigns and delivers to Buyer [Midmark], and Buyer hereby purchases and acquires from Seller…(e) [a]ll trade names, trademarks and trademark applications…and all other design, style, appearance and other common law trademarks owned by Seller relating to the Products or the Business and all rights of Seller or Sybron…therein or relating thereto, and all rights of Sybron to the trademark 'Ritter' as such rights relate to non-dental medical products… ; and (f) the goodwill related to the Products or the Business, if any."

*See* Ex. F—Wells (Vol. 1); *Id.* at Ex. F-2 at MID 521-22.

16. The transaction set forth in the 1986 Purchase Agreement closed on November 18, 1986 ("1986 Transaction"). *Id.* at MID 524. A Bill of Sale for the assets was signed by Liebel and Midmark on November 18, 1986. *Id.* at MID 729-30.

17. Based on the foregoing, all of Liebel's and Sybron's rights to the RITTER mark were assigned to Midmark on November 18, 1986. However, <u>on November 24, 1986</u>, Liebel filed a trademark application in the USPTO for the mark RITTER *in its own name*. *See* Ex. H—Peterson Rep. VII.A.2. at p.2. The application was file stamped by the USPTO Mail Room as received on November 24, 1986. *See* Ex. G—Wells (Vol. 2) 146:8-21; *Id.* at Ex. G-18 at MID 208-211. The '997 Registration issued from this application.

18. On November 24, 1986, Liebel did not own any rights to the trademark RITTER,

because it had assigned those rights to Midmark on November 18, 1986.[3] As such, the application filed on November 24, 1986, was void, and the resulting '997 Registration is invalid (and never was valid).

### ii. Undisputed Facts Establishing Midmark's Inability to Demonstrate Priority in RITTER for Dental Products

#### a. SPFM's Interest in the RITTER Trademark

19. SPFM's right to use the trademark RITTER for dental products derives from a German company called Ritter Concept GmbH ("Ritter Concept"), for whom SPFM is a distributor in the United States and from whom SPFM has received a trademark license. *See* Ex. B—F. Battah 98:19-100:6; *Id.* at Ex. B-8; Ex. C—Schmitz 44:7-23].

20. Ritter Concept manufactures and sells high-quality dental equipment and products, including dental chairs, units, compressors, and accessories throughout the world under the trademark RITTER. *See* Ex. C—Schmitz 31:8-32:6; Ex. D.—Schmitz Decl. ¶2.

21. Prior to distributing through SPFM, Ritter Concept had been selling RITTER dental products in the United States through a related entity called Ritter Concept America Corporation ("Ritter America"). The CEO of Ritter Concept testified that Ritter Concept started marketing its RITTER dental products in the United States in 2004-05, looking to build a strong network of distributors. Ritter America opened in McAllen, Texas in 2007 and started selling RITTER dental products into the United States in 2009 through small distributors. *See* Ex. C—Schmitz 45:22-51:18; Ex. D—Schmitz Decl. ¶¶3-4. Ritter Concept sold RITTER dental products in the United States through Ritter America continuously from 2009 until 2011, when SPFM became a

---

[3] That Liebel would file a new application for RITTER instead of Midmark, which had just paid millions of dollars for the RITTER business, is one of many facts that support SPFM's fraud claim but, for purposes of this motion, the only relevant fact is that Liebel filed a trademark application for RITTER after it had assigned its rights to Midmark; the reasons why it did so are immaterial.

distributor. *See* Ex. D—Schmitz Dec. ¶¶5-6.

22. Ritter Concept determined that it needed a broader distribution network and retained SPFM as its distributor in the United States pursuant to an agreement dated November 28, 2011. *See* Ex. C—Schmitz 44:2-46:25; *See* Ex. B-8. That agreement has been modified over time but, for purposes of this motion, SPFM remains the exclusive distributor and exclusive licensee of Ritter Concept in the United States. *See* Ex. B—F. Battah 100:3-101:22.

23. In addition to the RITTER trademark license from Ritter Concept, SPFM also received from Ritter Concept an Assignment of Enforcement Rights, whereby Ritter Concept assigned to SPFM the right to enforce and protect Ritter Concept's trademark rights in RITTER in the United States, including the appurtenant goodwill associated with the RITTER mark for dental products. *See* Ex. B—F. Battah 112:8-25; *Id.* at Ex. B-9; Ex. C—Schmitz 54:19-55:14.

### b. *Midmark's Interest in the RITTER Trademark for Medical, not Dental, Products*

24. Midmark's claims to interests in the RITTER trademark are based on the 1986 Transaction, when it acquired the RITTER *medical* products business from Liebel and Sybron. *See supra* ¶¶14-15. Midmark had not previously used the mark RITTER for any good or service. *See* Ex. F— Wells (Vol. 1) 12:25-15:4.

25. Prior to the 1986 Transaction, Sybron entered an agreement in 1985 with a German entity, Ritter Aktiengesellschaft ("Ritter AG"), by which Sybron and Ritter AG agreed to divide the RITTER business, agreeing that Ritter AG would own and use the mark RITTER for dental products and Sybron would own and use the mark RITTER for medical products (the "1985 Intellectual Property Agreement"). *See* Ex. F—Wells (Vol. 1) Ex. F-2 at MID 718-722. Midmark only purchased Sybron's rights pertaining to the RITTER medical business in the 1986 Transaction. As is quite telling with respect to pivotal issues underlying this Motion, and is

7

consistent with, and reinforcing of other evidence that will come forward in most other aspects of this case, Midmark acknowledged the division between the medical and dental markets to which the RITTER mark related. In fact, Midmark expressly agreed in the 1986 Transaction to assume Sybron's obligations to abide by the division of medical and dental rights pursuant to 1985 Intellectual Property Agreement. *See* Ex. F—Wells (Vol. 1) 14:2-16; 48:16-51:2; *Id.* at Ex. F-3 at MID 917-23.

26. Since the 1986 Transaction, Midmark has sold medical products under both the RITTER and MIDMARK trademarks. *See* Ex. F—Wells (Vol. 1) 13:9-14:16. Midmark's 30(b)(6) witness testified that Midmark has ongoing discussions with legal counsel about whether not to use the mark RITTER on dental products. *See* Ex. F—Wells (Vol. 1) 52:8-55:11. But, to date, Midmark has never sold dental products bearing the RITTER trademark. *See* Ex. F—Wells (Vol. 1) 130:10-131:21. Midmark continues to maintain a strict division of the medical and dental sides of its business. *See* Ex. E—Wells (Indiv.) 19:6-20, 21:9-19, 34:2-25; Ex. F—Wells (Vol. 1) Ex. F-11, which is consistent with the historical division of the medical and dental markets with the prior Ritter entities.

27. Midmark purports to own a trademark registration for RITTER for medical products, namely, the '997 Registration which SPFM seeks to cancel herein. *See* Ex. H—Peterson Report at ¶VII.A. For reasons unknown to SPFM and not germane to the present motion, but entirely consistent with, and indicative of the division between medical and dental products in this context (as well as the fact that Midmark's existing registration did not, and does not already cover dental products), Midmark has filed two trademark applications seeking registration of RITTER for dental products, in 1996 and in 2009, respectively. The first was abandoned, and the second was refused by final judgment of the TTAB. Midmark has never been issued a trademark

registration of RITTER for dental products, and Midmark has never declared under oath nor submitted any evidence to the USPTO to support a claim that it has used RITTER for dental products. *See* Ex. H—Peterson Report at ¶¶VIII.A. and C.

28.    Midmark provided testimony that it has sold certain RITTER-branded medical products, referred to by Midmark as "cross-overs," to customers in the dental market. *See* Ex. E—Wells (Indiv.) 61:5-62:25; Ex. F—Wells (Vol. 1) 130:10-131:21. Midmark's documentation produced in response to SPFM's discovery requests indicate that limited sales of the "cross-over" products began in 2010. *See* Ex. I—MID 015413; Ex. J—Resp. to Int. 10; Ex. K—Resp. to Doc Reqs. 17, 18, 25, 26.[4] In his deposition, Midmark's corporate representative appeared to suggest the "cross-over" sales began earlier: "We have some notes in 2006, we have some data, and we can pull it further back if that occurred." *See* Ex. F—Wells 91:21-23; 130:24-131:5.  However, over four months later, Midmark has not produced any documents or other evidence to support that assertion.

29.    Midmark admitted it has no evidence to show when and in what states its first sale of RITTER-branded products to the dental market occurred. Midmark's 30(b)(6) witness admitted that he was not prepared to testify about such information, stating that it would have to be requested from Midmark's "channel partners" but that Midmark had not requested the information. *See* Ex. G—Wells (Vol. 2) 166:7-168:5.

### III.    ARGUMENT AND AUTHORITY

**A.    The Standard for Summary Judgment.**

---

[4] Midmark's original answer in this case also stated that sales to the dental industry began in 2010 (see Dkt. 23 at ¶15). Midmark recently amended its answer to assert that sales began in 2005 (see Dkt. 55 at ¶16) but has provided no substantiation for that claim in response to SPFM's discovery requests or at the deposition of Midmark's corporate representative.

30.     Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508.

31.     Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

**B.    The '997 Registration is Void and Should be Cancelled.**

32. An application filed in the name of an entity that did not own the mark as of the filing date[5] of the application is void. 37 CFR 2.71.  Such an error in an application, even if inadvertent, is not correctable by amendment. The error also cannot be corrected by assignment; because the application is void, the applicant does not have a right to assign. TMEP 803.01; 803.06.

33. Trademark applications in the name of the wrong party are void, even where the error was inadvertent or unintended. In *Huang v. Tzu Wei Chen Food Co. Ltd.*, 849 F.2d 1458 (Fed. Cir. 1988), a trademark registration was found void and cancelled where the individual registrant mailed the underlying trademark application, through counsel, to the USPTO on April 27, incorporated an entity effective May 1, and the USPTO received the application on May 3. Because the incorporation effectively caused a transfer of the application from the individual to the corporation, and such transfer occurred before the USPTO received the application, the application was void for being filed in the name of a party who was not the owner. *Id.* at 1460. *See also Great Seats, Ltd. v. Great Seats, Inc.*, 84 USPQ2d 1235, 1239-44 (TTAB 2007)(owner of two entities filed application in name of the second entity, formed to assume the business of the first entity, but the trademark had not been assigned to the second entity before the filing date; registration cancelled).

34. In this case, the basis for finding Liebel's application void – that it did not own the mark when it filed the application to register RITTER – is a deficiency that by rule can <u>never</u> be corrected or satisfied. Liebel did not own the RITTER mark on November 24, 1986, the filing date of the application that resulted in the '997 Registration. *See supra* ¶¶14-17. Therefore, Liebel's application, and the '997 Registration are void. The '997 Registration should be cancelled.

**C.     Midmark Cannot Establish a Required Element for Each of its Claims.**

---

[5] The filing date is the date the application was received by the USPTO.  37 CFR 2.21.

### i.     *Midmark Must Prove Priority of Right in the Mark RITTER for Dental Products*.

35.     An essential element of every claim asserted by Midmark is proof that Midmark possesses a superior, legally protected right in the mark RITTER for dental products. *See Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir. 2008) (to recover on a claim of trademark infringement under Lanham Act, plaintiff must first show that the mark is legally protectable); *Condom Sense, Inc. v. Alshalabi*, 390 S.W.3d 734, 738 (Tex. App.—Dallas 2012, no pet.)(quoting *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc*., 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.)) ("The Texas common law elements of unfair competition, including trademark, 'are no different than those under federal trademark law.'").

36.     Midmark does not own a registration of the mark RITTER for dental products. Therefore, there are no presumptions of trademark ownership for Midmark, including no presumptions arising from Midmark's asserted '997 Registration for medical products. *See* 15 U.S.C §§ 1057(b); 1115(b) (registration is evidence only as to goods specified in the certificate).

37.     The TTAB held in 2012 that RITTER is a surname within the meaning of Section 2(e) of the Lanham Act. *In re Midmark Corporation* (TTAB 2012). *See* Ex. G—Wells (Vol. 2) Ex. G-17 at MID 1238-43.  As such, Midmark has a legally protected right in the mark only if it proves that there is a consumer association of the mark RITTER for dental products with a single source, which is referred to as "acquired distinctiveness" or "secondary meaning." *See* 2 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 13.2 (4th ed.) ("Since personal names are not regarded as being inherently distinctive marks, they can be protected as trademarks only upon proof that through usage, they have acquired distinctiveness and secondary meaning."); *Nolen v. Lufkin lndus., Inc.,* No. MO-10-CA-48-H, 2011 WL10581991 at *2 (W.D. Tex. Feb.3, 2011) (personal names may not secure protected trademark status until secondary meaning has attached).

38. Secondary meaning "occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211, 120 S. Ct. 1339, 1343 (2000). The inquiry is one of the public's mental association between the mark and the alleged mark holder. *Sno-Wizard Mfg., Inc. v. Eisemann Prods. Co.*, 791 F.2d 423, 427 (5th Cir. 1986). A mark has acquired secondary meaning when it "has come through use to be uniquely associated with a specific source." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998). The burden of demonstrating secondary meaning is on the alleged holder, is substantial and requires a high degree of proof. *See Test Masters Educational Services, Inc. v. Singh*, 428 F.3d 559, 567 (5th Cir. 2005).

39. The Fifth Circuit has applied a multi-factor test for determining secondary meaning. The factors include: "(1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the [mark]." *Pebble Beach*, 155 F.3d at 541. For these factors, the question is not simply the extent of each, but the effectiveness in leading the consuming public to association the mark with a single source. *See Nola Spice Designs, L.L.C. v. Haydel Enterprises, Inc.*, 783 F.3d 527, 544-545 (5th Cir. 2015). Moreover, the Fifth Circuit has "consistently expressed a preference for 'an objective survey of the public's perception of' the mark at issue." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 248 (5th Cir. 2010).

40. Although a factual question, the Fifth Circuit has recently affirmed findings on summary judgment that marks had not acquired secondary meaning. In *Nola Spice*, 783 F.3d at 544-547, the Court found no triable fact issue over the lack of secondary meaning where the

trademark proponent had used the mark for three and a half years prior to the alleged infringer's use, had low sales, substantial advertising expenditures but no evidence of their effectiveness in creating secondary meaning, and slim press coverage. In *Amazing Spaces*, 608 F.3d at 248-49, the Court affirmed that no fact issue was raised regarding the existence of secondary meaning because, even though there was 10 years of use, $725,000 in advertising expenditures, and $11.5 million in sales revenue, there was no objective survey evidence and no evidence of the effectiveness of any of such efforts to create recognition of the purported mark as a trademark and not just a decorative element.

41. In addition to substantial evidence effective to establish secondary meaning, in order to have priority over SPFM, Midmark must also provide evidence of the existence of such secondary meaning in its mark for dental products *at the time and place* that Ritter Concept[6] first began use of that mark in the United States. *Nola Spice*, 783 F.3d at 544 (only considering time-frame before first use of mark by defendant); *Co-Rect Products, Inc. v. Mavy! Advert. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (user must show that secondary meaning existed prior to date defendant commenced using the mark); *Commerce Ins. Agency, Inc. v. Commerce Nat'l Ins. Serv.*, 214 F.3d 432, 439 (3d Cir. 2000) (mark must acquire secondary meaning before first use by defendant); *Rockland Exposition, Inc. v. All. Of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 316 (S.D.N.Y. 2012) ("Plaintiff's burden is to establish that its mark acquired secondary meaning *before* Defendant began using its allegedly infringing mark.") (emphasis in original). *See also* McCarthy 16:34 ("In determining priority of ownership of a mark which requires secondary meaning, prime emphasis must be focused on when, where,

---

[6] SPFM claims its right to use the RITTER mark through Ritter Concept, as SPFM's licensor, and through the Assignment of Enforcement of Rights by which Ritter Concept conveyed to SPFM the right to assert and enforce Ritter Concept's rights in the RITTER mark. *See supra* ¶¶19-23.

and how secondary meaning was in fact established in the mark…[M]ere priority of use…is insufficient.")

42. Ritter Concept had pre-sales activities in the United States as early as 2004 and actual sales in at least as early as 2009. *See supra* ¶21. Therefore, even assuming the facts in the most favorable light for Midmark, Midmark must demonstrate secondary meaning in RITTER for dental products at least as early as 2009.

### ii. *Midmark Cannot Show Secondary Meaning for RITTER for Dental Products in 2009.*

43. The sum total of Midmark's evidence of secondary meaning in the mark RITTER for dental products in 2009 is their 30(b)(6) witness's vague, unsupported statement about "cross-over" sales of medical products to dental customers: "We have some notes in 2006, we have some data, and we can pull it further back if that occurred." *See supra* at ¶¶28-29.[7] There is no evidence of use of any length or manner of RITTER for dental products by that date; no evidence of extensive sales by that date; no evidence of the amount and manner of advertising by that date; no

---

[7] Whether Midmark's witness was woefully unprepared or being evasive, the end result is that Midmark cannot attempt now to offer evidence on this topic. *See e.g.*, *Function Media, L.L.C. v. Google, Inc.*, 2010 WL 276093, at *1 (E.D. Tex. Jan. 15, 2010) ("When the 30(b)(6) representative claims ignorance of a subject during the deposition, courts have precluded the corporation from later introducing evidence on that subject."). The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. The deponent must prepare the designee to the extent matters are reasonably available, whether from documents, past employees, or other sources. *Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 433 (5th Cir.2006). This information was explicitly identified under multiple deposition topics in the 30(b)(6) deposition notice to Midmark. *See* Ex. F—Wells (Vol. 1) Ex. F-1 at ¶¶ 10, 12-14, 17, 25 (asking for bases of ownership of trademark and for uses and activities of mark since 1984, including sales, channels of trade and the meaning of the mark). Midmark's witness even testified that the information regarding its "cross-over" sales and dates and locations of first sale could have been obtained. *See supra* at ¶¶28-29. When the 30(b)(6) witness is evasive or ignorant, there are only two conclusions: that Midmark did not prepare its witness and chose to withhold information during the discovery process or that Midmark truly does not have any knowledge or evidence. Federal Courts assume the latter as a matter of law and public policy. *See e.g.*, *Function Media, L.L.C.*, 2010 WL 276093, at *1.

evidence of use in newspapers and magazines by that date; no consumer-survey evidence as of that date; no direct consumer testimony as of that date. Instead, the record shows that Midmark has followed and continues to follow a decades-long division between the dental and medical markets, using RITTER only for medical products and MIDMARK for dental products. *See supra* at ¶¶26-27. Midmark has not produced any, let alone a high degree of, proof that it has a protectable interest in RITTER for dental products in 2009 and cannot satisfy its substantial burden in this case.

### a.   *Midmark Has No Use of RITTER on Dental Products.*

44. Midmark's corporate representative testified that Midmark does not use the mark RITTER on dental products. Midmark's failed attempts to register RITTER in the USPTO for dental products demonstrate the lack of use by Midmark. *See supra* at ¶¶26-27. Midmark cannot have secondary meaning in a mark on goods for which it does not use the mark because it is use itself which establishes secondary meaning. *See Commerce Ins. Agency, Inc.*, 214 F.3d at 439-40 (evidence of secondary meaning in banking industry not sufficient to show secondary meaning in insurance services industry).

### b.   *Midmark's Evidence Shows "Cross-Over" Sales Began in 2010.*

45. Midmark reaches and asserts that it should be deemed to have rights in the dental market because it has sales of certain RITTER-branded medical products, referred to by Midmark as "cross-overs," to customers in the dental market. Midmark's documentary evidence shows that "cross-over" sales began in 2010. *See supra* ¶28. This date is after Ritter Concept's first use in 2009 and, therefore, cannot as a matter of law constitute evidence of secondary meaning as of Ritter Concept's first use.

46. Midmark has given unsubstantiated testimony by Midmark's corporate

representative that there is "data" from 2006 concerning cross-over sales, although Midmark has not produced it to SPFM (and apparently has not even requested from the necessary parties). *See supra* ¶¶28-29. Even if this testimony is probative, Midmark has admitted that it cannot show when or where such sales occurred. *See Id*.

47. Midmark's evidence falls far short of meeting its burden to establish that the sales and advertising of the "cross-over" products were extensive and widespread enough to create secondary meaning for Midmark in the mark RITTER for dental products in 2009. Midmark has produced no other evidence from the relevant time frame, such as survey evidence, large expenditures to advertise or promote RITTER in the dental market, the scope of publicity given to RITTER in the dental market, other evidence of wide exposure, consumer affidavits and the like, to show that its sales of "cross-over" RITTER-branded medical products to customers in the dental industry led consumers in 2009 to understand the name RITTER on dental products to identify Midmark and only Midmark. *See Nola Spice*, 783 F.3d at 543 (on summary judgment, lack of evidence of secondary meaning shifts burden to trademark proponent to demonstrate by competent summary judgment proof that there is a genuine issue of fact warranting trial). Midmark had its opportunity to produce evidence of such secondary meaning, and it failed to do so.

        ***c.***     ***A 2012 Final Judgment Held that Midmark's Alleged Rights in Medical Products Do Not Extend to Dental Products.***

48. Midmark's alleged rights in RITTER for medical products cannot demonstrate secondary meaning for dental products in 2009. This issue was already litigated in connection with Midmark's failed 2009 application to register the mark RITTER for dental products. Midmark filed an application on May 6, 2009, to register RITTER for a variety of dental products, based on a bona fide intention to use the mark (not actual use). The application was refused on grounds that RITTER is a surname, *See* Ex. H—Peterson Rep. VIII.C.2 at p. 12, a finding that was upheld by

17

the TTAB on appeal. *See* Ex. G—Wells (Vol. 2) Ex. G-17. Midmark argued that the secondary meaning allegedly signified by the '997 Registration for medical products extended to dental products. The trademark examiner disagreed and issued a final refusal on May 10, 2010. *See* Ex. H—Peterson Rep. VIII.C.2 at p.13; Ex. G—Wells (Vol. 2) Ex. G-18 at MID 307-311. Midmark's "extension" argument failed again on reconsideration by decision dated November 29, 2010, *See* Ex. H—Peterson Rep. VIII.C.2 at p.13; Ex. G—Wells (Vol. 2) Ex. G-18 at MID 295-97, and Midmark's "extension" argument failed yet again on appeal to the TTAB, which held on September 28, 2012:

> With regard to those goods in the application which specify that they are for "dental" uses, we do not find them to be related simply because the registered goods state they are for "medical" uses. There is no evidence in the record to demonstrate that the references to medical products of the type in the registration include or are related to dental products of the type recited in the application. [Applicant's] broad statement that 'many medical products also find use in the dental field' is lacking in specificity and does not assist applicant in demonstrating a relationship between such goods. Accordingly, applicant's ownership of the prior registration and its use of RITTER for goods set forth in the registration since 1919 do not establish acquired distinctiveness of the proposed mark now sought to be registered [i.e., RITTER for dental products].

*See* Ex. G—Wells (Vol. 2) Ex. G-17 at MID 1246-47.

49. Midmark did not appeal the decision of the TTAB, which is now a final judgment. Midmark submitted its evidence and arguments in support of its case before the TTAB between 2010 and 2012, and it was insufficient at that time to show any extension of secondary meaning from medical products to dental products. Such extension of rights, therefore, could not have existed even before then, in 2009.[8]

---

[8] Midmark is estopped by the TTAB's judgment from attempting to prove secondary meaning prior to 2012. The TTAB considered the same facts and applied the same legal test for whether the mark had acquired secondary meaning as this Court would apply and, because this inquiry for this motion is limited to whether the mark had secondary meaning in 2009, there is no chance of new evidence being helpful. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1307-10 (2015) (TTAB decisions are preclusive where the test is the same); *Test Masters Educ. Services,*

50. Under no theory of fact or law can Midmark demonstrate that, in 2009, it possessed secondary meaning in the mark RITTER for dental products. Midmark cannot satisfy an essential element of its infringement and unfair competition claims, and judgment should be granted in favor of SPFM.

### iii. *Midmark Has Not Shown Ownership of a Texas State Trademark Registration*

51. A necessary element of Midmark's "Count Three," which alleges a violation of Texas Bus. & Com. Code § 16.102, is ownership of a trademark registration issued by the State of Texas. The requirement of a state registration is stated within the statute itself, in subsection (a)(1) and (2). *See id.* (referring to infringement "of a mark registered under this chapter"). *See also Vesta Corporation v. Vesta Management Services, LLC,* Case No. 4:15-cv-00719, Memorandum Order, Dkt. No. 39 (Sept. 30, 2016 S.D. Tex. 2016) at pp. 29-30, *distinguishing Philip Morris USA Inc. v. Lee*, 549 F. Supp. 2d 839, 847 (W.D. Tex. 2008). Midmark does not assert ownership of a Texas registration for RITTER or ULTRACOMFORT in its complaint and has not produced evidence of any such registration in discovery. Midmark's "Count Three" must fail as a matter of law.

## IV.    CONCLUSION

SPFM submits that partial summary judgment should be granted to SPFM on all of Midmark's counterclaims pertaining to the RITTER trademark and that the '997 Registration should be cancelled. Accordingly, SPFM respectfully requests that the Court grant this Motion, and grant such other and further relief to which SPFM may show itself entitled.

Dated: January 31, 2017              Respectfully Submitted

---

*Inc. v. Singh*, 428 F.3d 559, 573 (5th Cir. 2005) (party estopped/precluded due to prior finding regarding secondary meaning of a mark).

        Gray, Reed & McGraw, P.C.

        */s/ Daryl W. Bailey*
        David G. Henry
        State Bar No. 09479355
        dhenry@grayreed.com
        Daryl W. Bailey
        State Bar No. 01520050
        dbailey@grayreed.com
        GRAY REED & MCGRAW, P.C.
        1300 Post Oak Blvd., Suite 2000
        Houston, Texas 77056
        T: (713) 986-7000
        F: (713) 986-7100

        **ATTORNEYS FOR PLAINTIFF,**
        **SPFM LP**

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that on January 31, 2017, a true and correct copy of the foregoing document was served upon all known counsel of record through the Court's ECF system pursuant to Federal Rule of Civil Procedure 5(b)(3) and Local Rule CV-5.

        */s/ Daryl W. Bailey*
        Daryl W. Bailey