# EXHIBIT F-1

Wells 30(b)(6), Vol. 1,  Depo. Ex. 1

Document1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SPFM, LP d/b/a | § | |
| RITTER DENTAL USA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 5:15-CV-124 |
| v. | § | |
| | § | |
| MIDMARK CORPORATION. | § | |
| | § | |
| Defendant. | § | |

## AMENDED NOTICE OF ORAL AND VIDEOTAPED DEPOSITION AND SUBPOENA DUCES TECUM OF CORPORATE REPRESENTATIVE OF DEFENDANT MIDMARK, INC.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiff will take the oral deposition of the designated representative(s) of Defendant Midmark Corporation. Production of documents requested herein, and not yet produced in this Case, shall be at **9:00 am on September 8, 2016**, at the offices of **Wood Herron & Evans, LLP, 2700 Carew Tower, 441 Vine Street, Cincinnati, Ohio, 45202**, or at such other location as the parties mutually agree. The deposition will commence before a duly authorized court reporter on **September 8, 2016**, beginning at **9:30 a.m.** at the offices of **Wood Herron & Evans, LLP, 2700 Carew Tower, 441 Vine Street, Cincinnati, Ohio, 45202**, or at such other location as the parties mutually agree. Said deposition or depositions will continue from day to day until completed. The deposition will be recorded by stenographic means and may be videotaped.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Defendant shall designate the person or persons to testify on behalf of the corporation with respect to each of the categories ("Topics") enumerated below.

3543628.1



EXHIBIT
Mid 1

## DEFINITIONS

1.      "Plaintiff," or "SPFM," as used herein, refer to Plaintiff SPFM, LP, including without limitation its successors in interest, agents, representatives, employees, consultants, attorneys, or entities acting in conjunction, joint venture, or partnership with Plaintiff, or any entities acting under its direction or control.

2.      "Midmark," as used herein, means Midmark Corporation. and any of the agents, employees, shareholders, officers, former employees, former officers, directors, subsidiaries, parent corporations, attorneys or other persons or entities acting on its behalf.

3.      "Complaint," as used herein, means the complaint in SPFM, LP d/b/a Ritter Dental USA v. Midmark Corporation; Civ. No. 5:15-CV-124 (W.D. Tex., February 17, 2015) (Dkt. No. 1).

4.      The terms "person," "party" and "third party" (singular or plural) as used herein, include any natural person, firm, association, organization, partnership, business, trust, corporation, limited liability company, governmental entity, or other business, governmental, or public entity.

5.      "Document(s)," and "Record" (singular or plural) as used herein, subject to limitations, if any, of the Federal Rules of Civil Procedure, the Local Rules of the Western District of Texas, and the present Court's orders applicable to this case, shall be interpreted in the broadest possible sense and at a minimum shall be synonymous in meaning and equal in scope to the usage of this term in Rule 34(a) of the Federal Rules of Civil Procedure, and also includes anything that would be a "writing" or "recording" as defined by Rule 1001(1) of the Federal Rules of Evidence.

6.      "Thing(s)," as used herein, means any tangible item, and shall be construed as

broadly as possible construction under the Federal Rules of Civil Procedure, including surgical instruments and components.

7.     "Case," as used herein, means any lawsuit, dispute resolution proceeding (including but not limited to mediation or arbitration), or patent reexamination, review, or interference proceeding, whether pending or settled, whether inter partes or ex parte, whether before a civil court, the United States Patent and Trademark Office ("USPTO"), a foreign court or trademark office or authority, an arbitrator, or a mediator.

8.     "Communication," as used herein, means any oral, written, or electronic transmittal of information or request for information made from one person to another person, whether made in person, electronically, by telephone, or by any other means and includes any Document(s) made only for the purpose of recording a communication, a fact, an idea, a statement, an inquiry, an opinion, a belief, or otherwise.

9.     As used herein, the terms "relate" and "refer" are used in their broadest possible sense and include all matters comprising, constituting, containing, concerning, embodying, reflecting, involving, discussing, describing, analyzing, identifying, stating, referring to, dealing with, or in any way pertaining to.

10.     As used herein, "and" and "or" shall each be construed disjunctively or conjunctively as necessary in order to bring within the scope of the Request all Documents that might otherwise be construed to be outside its scope.

11.     As used herein, "each" shall be construed to include the word "every" and "every" shall be construed to include the word "each" as necessary in order to bring within the scope of the Request all Documents that might otherwise be construed to be outside its scope.

3543628.1                                           3

12.     As used herein, "any" shall be construed to include the word "all" and "all" shall be construed to include the word "any" as necessary in order to bring within the scope of the Request all Documents that might otherwise be construed to be outside its scope.

13.     As used herein, "include" or "including" means including but not limited to and should not be read to limit the scope of any particular Request, but merely as illustrative of some information that would be responsive.

14.     As used herein, the singular form of a noun or a pronoun shall be considered to include within its meaning the plural form of a noun or a pronoun so used, and vice versa; the use of the masculine form of a pronoun shall be considered to include also within its meaning the feminine form of the pronoun so used, and vice versa; the use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb so used.

13.     "Communication," as used herein, means any oral, written, or electronic transmittal of information or request for information made from one person to another person, whether made in person, electronically, by telephone, or by any other means and includes any Document(s) made only for the purpose of recording a communication, a fact, an idea, a statement, an inquiry, an opinion, a belief, or otherwise.

14.     "Agreement," as used herein, means any contract, transaction, license, or other arrangement of any kind, whether conditional, executed, executory, express, or implied, and whether oral or written, in which rights are granted or obligations are assumed. The term "agreement" shall encompass completed, actual, contemplated, or attempted agreements or renewals of agreements.

## INSTRUCTIONS

1.      All Documents and Things must be produced in a form that renders them susceptible to copying.

2.      All electronic Documents and records must be produced with an explanation sufficient to render the records and information intelligible.

3.      Documents from any single file should be produced in the same order as they were found in such file. If copies of Documents are produced in lieu of the originals, such copies should be legible and bound or stapled in the same manner as the original.

4.      Each Document or Thing should be segregated and identified by the Request to which it is primarily responsive or produced as it is kept in the ordinary course of business.

5.      All Requests herein are directed to those Documents and Things within Your possession, custody or control, or within the possession, custody or control of Your agents, servants and employees and Your attorneys. They are also directed to those firms, corporations, partnerships, or trusts that You control and to Documents and Things in the possession, custody or control of employees, agents and representatives of such entities.

6.      If any of the Documents or Things requested herein are no longer in your possession, custody or control, identify each such requested Document or Thing by date, type of Document or Thing, person(s) from whom sent, person(s) to whom sent, and person(s) receiving copies and provide a summary of its pertinent contents.

7.      If any of the Documents or Things requested herein has been destroyed or is no longer in existence, for any reason, describe the content of such Document or Thing as completely as possible, the date of such destruction and the name of the person who ordered or authorized such destruction.

8.      With respect to any Document or Thing that You are withholding because the Document or Thing is asserted to be immune from discovery, state separately with respect to each Document or Thing:

(a)      the general nature of such Document or Thing, i.e., whether it is a letter, memorandum, report, pamphlet, component, etc.;

(b)      the date on which each such Document or Thing was created, reproduced or transcribed;

(c)      the name, title, and business address of each person who signed or prepared each such Document or Thing and the name, title, and business address of each person who has edited, corrected, revised or amended the Document or Thing;

(d)      the name, title, and business address of each person to whom each such Document or Thing was communicated or made available, or otherwise known to You as being an intended or actual recipient of a copy thereof;

(e)      the name, title, and business address of each person having knowledge of the contents of the Document or Thing;

(f)      the name, title, and business address of each person having possession, custody, or control of the Document or Thing or any identical or non-identical copy;

(g)      the number of pages;

(h)      a brief description of the nature and subject matter of the Document or Thing in sufficient detail to permit Midmark to assess the applicability of the asserted privilege or immunity;

(i)      the paragraph(s) of the Request to which the Document or Thing is responsive; and

3543628.1                                              6

(j)    the grounds for the claimed immunity.

9.    There shall be a continuing duty on Midmark to furnish additional Documents and Things in response to these Requests in accordance with Rule 26(e) of the Federal Rules of Civil Procedure. Any additional information relating in any way to these Requests that You acquire, or that becomes known to You, up to and including at the time of trial, shall be furnished to Midmark promptly after such information is acquired by You or becomes known to You.

10.    If You find any Request or any term used in a Request to be vague, ambiguous, subject to varying interpretations, or unclear, state what portion of the Request or term You find to be vague, ambiguous, subject to varying interpretations, or unclear and state the construction employed by You in responding to the Request.

11.    In producing Documents and Things responsive to these Requests, Midmark shall furnish all Documents and Things within its possession, custody, or control, regardless of whether these Documents are possessed directly by Midmark, or by its present or past agents, employees, representatives, investigators, or attorneys.

## TOPICS

1.     Midmark's awareness of, and information related to SPFM (whether known as "SPFM", or by any other name, including "RITTER DENTAL USA") and SPFM's use of RITTER and/or ULTRACOMFORT, including, but not limited to, when and how Midmark became first aware of SPFM's use of RITTER and/or ULTRACOMFORT and Midmark's discussions and/or decisions relating to SPFM's use of RITTER and/or ULTRACOMFORT.

2.     Excluding the scope of the preceding topic, Midmark's awareness of, and information related to, since 1984, any third party use of RITTER in the United States in association with dental practice equipment, implants, or supplies, including, but not limited to, when and how Midmark became first aware of such use.

3.     Midmark's awareness of, and information related to, since 1984, any third party use of RITTER outside of the United States in association with dental practice equipment, implants, or supplies, including, but not limited to, when and how Midmark became first aware of such use.

4.     Midmark's communications and transactions, since 1984, (including the time(s) and substance of such communications) with any third party or parties (other than Ritter Concept GmbH, its predecessors, successors, assigns, affiliates, licensees, agents, distributors, or others in any way associated with Ritter Concept GmbH) and relating to Midmark's and such third party's or parties' respective uses of, and/or rights in RITTER (wherever occurring or purported to exist).

5.     Midmark's communications and transactions, since 1984, (including the time(s) and substance of such communications) with Ritter Concept GmbH, its predecessors, successors, assigns, affiliates, licensees, agents, distributors, and/or others in any way associated with Ritter Concept GmbH (collectively "Ritter Concept") and relating to Midmark's and Ritter Concept's respective uses of, and/or rights in RITTER (wherever occurring or purported to exist).

6.     Midmark's activities and experiences, and records reflecting such activities and experiences, in relation to seeking trademark protection or registration for or of RITTER (or any colorable imitation or translation thereof) in any country or jurisdiction since the earlier of 1984, or Midmark's first such activity.

7.     Midmark's communications since the earlier of 1984, or Midmark's first such activity (including the time(s) and substance of such communications) with any third party or parties related, in whole or in part, to any distinction between the use of RITTER in connection with dental versus medical products.

8.     Midmark's awareness of, and/or enforcement or other actions taken, since the earlier of 1984, or Midmark's first such activity, in relation to third parties' infringement and/or use of RITTER and/or ULTRACOMFORT.

9.     Enforcement or other actions taken by Midmark against other persons' or entities' alleged infringement and/or use of any mark purportedly owned by Midmark

10.   The corporate structure and/or organization of Midmark's medical and dental product lines, including but not limited to, the extent, if any, of the overlap between the sales and marketing personnel, the target customers, and the channels of trade.

11.   Midmark's policies and procedures to enforce its claimed rights in and to RITTER, ULTRACOMFORT, and trade and service marks in general.

12.   The bases (including, as applicable, and without limitation, assignments, licenses, succession to the rights of predecessors in interest, and the earliest known use to which Midmark alleges it is entitled for establishing any claim to ownership) for Midmark's alleged ownership of RITTER.

13.   Each specific product or service currently or previously sold, offered, or manufactured by Midmark, since the latter of 1984, or Midmark's first such activity, using, displaying, associated with RITTER.

14.   The date of first use by Midmark for each product or service identified in the preceding topic 13.

15.   Midmark's annual promotional and marketing costs and/or intended or expected budget for promotional and marketing costs attributable to each product or service identified in the preceding topic 13, for each year from the date of first use to the present.

16.     All advertising and/or promotional schedules already run, currently running, or intended to be run for any Midmark products or services in relation to RITTER and/or ULTRACOMFORT, including an identification of all methods of advertising used or intended to be used by Midmark to promote the products or services identified in response to the preceding topic 13.

17.     Midmark's annual and monthly gross dollar sales and/or expected or projected gross dollar sales of the products or services identified in Topic No. 13, from the date of first use to the present.

18.     The bases (including, as applicable, and without limitation, assignments, licenses, succession to the rights of predecessors in interest, and the earliest known use to which Midmark alleges it is entitled for establishing any claim to ownership) for Midmark's alleged ownership of ULTRACOMFORT.

19.     Each specific product or service currently or previously sold, offered, or manufactured by Midmark, since the latter of 1984, or Midmark's first such activity, using, displaying, associated with ULTRACOMFORT.

20.     The date of first use by Midmark for each product or service identified in the preceding topic 19.

21.     Midmark's annual promotional and marketing costs and/or intended or expected budget

for promotional and marketing costs attributable to each product or service identified in the preceding topic 19, for each year from the date of first use to the present.

22.     All advertising and/or promotional schedules already run, currently running, or intended to be run for any Midmark products or services in relation to RITTER and/or ULTRACOMFORT, including an identification of all methods of advertising used or intended to be used by Midmark to promote the products or services identified in response to the preceding topic 19.

23.     Midmark's annual and monthly gross dollar sales and/or expected or projected gross dollar sales of the products or services identified in Topic No. 19, from the date of first use to the present.

24.     All information known to, or possessed by Midmark reflecting any and all alleged incidents of confusion relating to SPFM's use of RITTER and/or ULTRACOMFORT, and the identity and location of all records reflected such alleged instances.

25.     The meaning, commercial impression, target market, channels of distribution (including intended channels of distribution), and channels of trade for Midmark products sold under or otherwise displaying RITTER and/or ULTRACOMFORT.

26.     The adoption by Midmark of the underlying mark, the decision to file, the filing, the prosecution, the maintenance, or the abandonment of U.S. Trademark Application No.

3543628.1

78/284,391.

27.    The adoption by Midmark of the underlying mark, the decision to file, the filing, the prosecution, or the maintenance of U.S. Trademark Application No. 77/730355.

28.    The adoption by Midmark of the underlying mark, the decision to file, the filing, the prosecution, or the maintenance of U.S. Trademark Application No. 75/170487.

29.    The adoption by Midmark of the underlying mark, the decision to file, the filing, the prosecution, or the maintenance of U.S. Trademark Registration No. 1451997.

30.    The adoption by Midmark of the underlying mark, the decision to file, the filing, the prosecution, or the maintenance of U.S. Trademark Registration No. 3,144,518.

31.    Transactions reflecting Midmark's acquisition of ownership, licensing, goodwill, or other rights in or to RITTER and/or ULTRACOMFORT

32.    All information known to, or possessed by Midmark relating to third party uses of RITTER and/or ULTRACOMFORT and considered by Midmark to be confusingly similar to RITTER and/or ULTRACOMFORT as used by Midmark.

33.    All information known to, or possessed by Midmark relating to third party uses of RITTER and/or ULTRACOMFORT and not considered by Midmark to be confusingly similar to

RITTER and/or ULTRACOMFORT as used by Midmark.

34.   All information known to, or possessed by Midmark reflecting consumer recognition of RITTER and/or ULTRACOMFORT to identify dental and dental-related products advertised, marketed, sold, offered, and/or distributed by Midmark.

35.   Midmark's alleged goodwill in RITTER and/or ULTRACOMFORT in connection to Midmark's efforts to advertise, market, sell, offer to sell, and/or distribute dental and dental-related goods or services.

36.   The monetary damages alleged suffered by Midmark caused by SPFM's use of RITTER and/or ULTIMATE COMFORT.

37.   The bases for, and all information supporting Midmark's asserted right of monetary recovery in this Case.

38.   The bases for, and all information supporting Midmark's alleged entitlement, if any, to injunctive relief in relation to SPFM's use of any trademark.

39.   All activities of, communications (including those involving third parties) by or with Midmark's Mr. Jon Wells, and all related records of such activities or communications that in any way related to Midmark's claimed rights in RITTER and/or any alleged third party's or parties' infringement thereof.

## SUBPOENA DUCES TECUM

1.     All documents, communications, and things evidencing Midmark's awareness of any third party's (including SPFM) use of RITTER or ULTRACOMFORT.

2.     All documents, communications, and things since the earlier of 1984, or Midmark's first such activity (including the time(s) and substance of such communications), with any third party or parties related, in whole or in part, to any distinction between the use of RITTER in connection with dental versus medical products.

3.     Sufficient documents, communications, and things evidencing the corporate structure and/or organization of Midmark's medical and dental product lines, including but not limited to, the extent, if any, of the overlap between the sales and marketing personnel, the target customers, and the channels of trade.

4.     All documents, communications, and things evidencing the bases (including, as applicable, and without limitation, assignments, licenses, succession to the rights of predecessors in interest, and the earliest known use to which Midmark alleges it is entitled for establishing any claim to ownership) for Midmark's alleged ownership of RITTER.

5.     Sufficient documents, communications, and things to show each specific product or service currently or previously sold, offered, or manufactured by Midmark, since the latter of 1984, or Midmark's first such activity, using, displaying, associated with RITTER, including the date of first use for each product or service.

6.     Sufficient documents, communications, and things to show Midmark's annual promotional and marketing costs and/or intended or expected budget for promotional and

3543628.1                                    15

marketing costs attributable to each product or service identified in the preceding Topic No. 13, for each year from the date of first use to the present.

7.     Sufficient documents, communications, and things to show all advertising and/or promotional schedules already run, currently running, or intended to be run for any Midmark products or services in relation to RITTER and/or ULTRACOMFORT, including an identification of all methods of advertising used or intended to be used by Midmark to promote the products or services identified in response to the preceding Topic No. 13.

8.     Sufficient documents, communications, and things to show Midmark's annual and monthly gross dollar sales and/or expected or projected gross dollar sales of the products or services identified in Topic No. 13, from the date of first use to the present.

9.     Sufficient documents, communications, and things to show each specific product or service currently or previously sold, offered, or manufactured by Midmark, since the latter of 1984, or Midmark's first such activity, using, displaying, associated with ULTRACOMFORT, including the date of first use for each product or service.

10.    Sufficient documents, communications, and things to show Midmark's annual promotional and marketing costs and/or intended or expected budget for promotional and marketing costs attributable to each product or service identified in the preceding Topic No. 19, for each year from the date of first use to the present.

11.    Sufficient documents, communications, and things to show all advertising and/or promotional schedules already run, currently running, or intended to be run for any Midmark products or services in relation to RITTER and/or ULTRACOMFORT, including an

identification of all methods of advertising used or intended to be used by Midmark to promote the products or services identified in response to the preceding Topic No. 19.

12.   Sufficient documents, communications, and things to show Midmark's annual and monthly gross dollar sales and/or expected or projected gross dollar sales of the products or services identified in Topic No. 19, from the date of first use to the present.

13.   All documents, communications, and things evidencing all information known to, or possessed by Midmark relating to third party uses of RITTER and/or ULTRACOMFORT and considered by Midmark to be confusingly similar to RITTER and/or ULTRACOMFORT as used by Midmark.

14.   All documents, communications, and things evidencing all information known to, or possessed by Midmark relating to third party uses of RITTER and/or ULTRACOMFORT and not considered by Midmark to be confusingly similar to RITTER and/or ULTRACOMFORT as used by Midmark.

15.   All documents, communications, and things supporting Midmark's alleged entitlement, if any, to injunctive relief in relation to SPFM's use of any trademark.

16.   All documents, communications, and things evidencing all activities of, communications (including those involving third parties) by or with Midmark's Mr. Jon Wells, and all related records of such activities or communications that in any way related to Midmark's claimed rights in RITTER and/or any alleged third party's or parties' infringement thereof.

Dated: September 8, 2016

Respectfully submitted,

By: ___/s/ Daryl W. Bailey___
David G. Henry
Texas Bar No. 09479355
dhenry@grayreed.com
Daryl W. Bailey
State Bar No. 01520050
dbailey@grayreed.com
Michael D. Ellis
Texas Bar No. 24081586
mellis@grayreed.com
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
(713) 986-7000
(713) 986-7100 (Telefax)
**Gray Reed & McGraw, P.C.**

**ATTORNEYS FOR PLAINTIFF SPFM L.P.
d/b/a RITTER DENTAL USA**

3543628.1

18

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 8, 2016, a true and correct copy of the foregoing document was served upon all Defendant Midmark Corporation's counsel of record via email:

J. Daniel Harkins
Amy Davis
DYKEMA COX SMITH
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
T: (210) 554-5500
DHarkins@dykema.com
ADavis@dykema.com

And

Charles H. Brown, III
Sean K. Owens
WOOD HERRON & EVANS LLP
277 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202
T: (513) 241-2324
cbrown@whe-law.com
sowens@whe-law.com

*Attorneys for Defendant*
*Midmark Corporation*

      */s/ Michael D. Ellis*
       Michael D. Ellis

CONFIDNTIAL - ATTORNEYS EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SPFM L.P., dba RITTER DENTAL USA, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION No. 5:15-CV-124 |
| | ) |
| MIDMARK CORPORATION, | ) |
| | ) |
| | ) |
|    Defendant. | ) |

## EXPERT REBUTTAL REPORT OF KENNETH A. HOLLANDER

I, Kenneth A. Hollander, declare as follows:

### A.  MY ENGAGEMENT

1.     I have been retained by the law firm of Wood Herron & Evans LLP, outside legal counsel to Defendant Midmark Corporation in this case, to review and comment upon the Plaintiff's Expert Report of Robert L. Klein dated February 26, 2016 (the "Klein Report").  My review of the Klein Report is included herein.

### B.  MY QUALIFICATIONS

2.     I graduated from The Ohio State University with a Bachelor of Science degree in Marketing in 1959.  I then obtained a Masters degree in Marketing from the University of Missouri in 1963.

3.     Prior to starting Kenneth Hollander Associates in 1973, my employment history included the following:

    a.   Research Brand Manager, The Procter & Gamble Company, 1959 to

        1961, in which I served on a two-man Experimental Research and

1

**CONFIDNTIAL - ATTORNEYS EYES ONLY**

Technique Development team responsible for all unique, non-recurring research issues concerning all P&G brands.

b. <u>Associate Research Director, Hallmark Cards, 1961 to 1964,</u> in which I was responsible for all greeting card research as well as acquisitions and mergers explorations.

c. <u>Director of Research, Young & Rubicam, Chicago, 1964 to 1970,</u> in which I was responsible for all research for all of the agency's clients, including Allied Van Lines, American Paper Corporation, Armour Dial, International Harvester, and U.S. Naval Recruiting.

d. <u>Vice President, Director of Communications Planning Group, The Interpublic Group of Companies, 1970 to 1973,</u> in which I was responsible for all communications research for the Coca-Cola Company, both domestic and international.

e. I have lectured at the Graduate Schools of Business at Emory University, Stanford University, and The University of Georgia.

f. At the University of Georgia, I was Chairman of the Board of Advisors for the Masters of Marketing Research Program and a Distinguished Practitioner Lecturer in the Department of Marketing.

g. I was a Contributing Editor to the textbook, <u>Advertising</u>.

h. I have spoken about marketing and surveys at events sponsored by the American Marketing Association, The Association of National Advertisers, The Advertising Research Foundation, and the Marketing Research Association.

2

CONFIDNTIAL - ATTORNEYS EYES ONLY

4.      I have conducted over 3,000 consumer surveys for many of the world's largest and most prominent companies, including but not limited to: Anheuser Busch, Bank of America, The Coca-Cola Company, Delta Air Lines, Eastman Kodak, Ford Motor Company, General Electric, Heublein, IBM, Johnson & Johnson, Lever Brothers, Kimberly-Clark, Mattel, No Nonsense, Pillsbury, Quaker Oats, Ralston-Purina, STP, Texas Instruments, Uncle Ben's, Verizon, Wachovia, Xerox, and Young & Rubicam.

5.      I have served as an expert witness in the United States Federal Court System on matters pertaining to marketing research. In such capacity I have conducted, critiqued, or counseled on over 150 trademark and false advertising surveys conducted for the purpose of litigation. I have been deposed or testified as an expert witness approximately 40 times in trademark infringement lawsuits. My substantial experience in marketing and surveys provides me with the background necessary to analyze and evaluate the survey described in this declaration.

6.      My curriculum vitae including the cases in which I have testified over the past four years and a list of all publications authored by me in the past 10 years is attached in Appendix A. My company bills my time at the rate of $550 per hour and my compensation is not in any way dependent on the outcome of this case.

7.      In the past four years I have testified either at deposition or trial in the matters in 9 cases across the U.S.  See Appendix A.

**CONFIDNTIAL - ATTORNEYS EYES ONLY**

### C. SUMMARY OF OPINION

8.    Mr. Klein states in the Klein Report that he was asked "to design, execute and analyze a market research survey that would measure the likelihood of confusion, if any, between SPFM and Midmark caused by SPFM's use of the 'RITTER' mark for dental products." Klein Report at 2.  I believe that Mr. Klein failed in this task because he elected to use an inappropriate survey protocol which could not properly measure the likelihood of confusion caused by SPFM's use of the RITTER mark for dental services.  Thus he asked the wrong questions.

### D.  DESCRIPTION OF THE KLEIN REPORT & SURVEY

9.    According to the Klein Report, Mr. Klein conducted a survey of 205 Internet interviews using the Research Now panel company (the "Klein Survey").

10.    Eligible respondents were practicing dentists, over the age of 18, who make or share in the decisions about purchasing dental equipment, products, or supplies.  Klein Report at 5.

11.    After screening respondents for eligibility, the Klein Survey followed the "Eveready" protocol in which, in an instance of alleged forward confusion, respondents see an exemplar of the junior mark and are asked a series of open-ended questions about it.

12.    In the Klein Survey the respondents were shown a Ritter Dental website screenshot and were asked, *"Who or what company do you believe makes or puts out these dental products?"* and, for those with an opinion, *"Why do you say that?"* followed by *"What other products are you aware of that are put out using the Ritter name?"* and, for those with an opinion, *"Who or what company do you believe puts out these other Ritter products?"* and *"Why do you say that?"* Klein Report at 8.

4

CONFIDNTIAL - ATTORNEYS EYES ONLY

13.     All respondents were then asked, *"Do you believe that the company that puts out these dental products has a business connection or affiliation with another company?"* and, for those believing it does, *"With what other company does the company that puts out these products have a business connection or affiliation?"* and *"Why do you say that?"* Klein Report at 9.

14.     Finally, all respondents were asked, *"Do you believe that the company that puts out these dental products needed to get authorization or approval from another company?"* and, for those so believing, *"What other company or companies do you believe they needed to get authorization or approval from?"* and *"Why do you say that?"* Klein Report at 9.

### E.  DEFECTS OF THE KLEIN SURVEY

15.     Surveys conducted to aid decisions in litigation should be conducted in accordance with the principles and standards delineated in the <u>Manual for Complex Litigation</u>, Fourth Edition, 2004, prepared by the Federal Judicial Center. These principles provide the best assurance that the data collected are valid and can be relied upon to draw conclusions regarding consumers' opinions and behavior.

16.     In short: were the proper respondents asked the proper questions?

17.     My review of the Klein Report and Klein Survey shows that, assuming Mr. Klein selected the proper group of respondents, he asked the wrong questions because he chose an inappropriate survey protocol.  Thus, his survey results are not reliable because they do not accurately reflect the likelihood of confusion caused by SPFM's use of the RITTER mark in the dental market.

18.     Mr. Klein states that, "The survey employed a design adapted from the widely accepted 'Eveready' format to evaluate likelihood of confusion. In a typical Eveready survey, respondents are presented with the junior user's product or mark and are then asked open-ended

5

CONFIDNTIAL - ATTORNEYS EYES ONLY

questions about the source of the product. This format is an appropriate design to measure consumer

confusion when the senior mark is 'strong and widely recognized.' It is my understanding that

Midmark is a well-established company with a 100-year history of providing a range of products for

doctors and dentists and that the Eveready format is an appropriate survey design to measure

likelihood of confusion." Klein Report at 3.

19.       While Midmark is indeed "a well-established company with a 100-year history of

providing a wide range of products for doctors and dentists," the Eveready survey would only be

appropriate if the Ritter mark were a sufficiently strong mark and dominant mark.  However,

Eveready surveys are not designed for the facts in the present case, where Midmark's RITTER

mark is not the dominant mark in the marketplace.  Thus, such surveys do not provide evidence

relating to actual or potential confusion under these circumstances.  The format Mr. Klein should

have used was the Squirt Protocol.  The reasons for these opinions follow.

20.       First, the noted attorney and author, Jerre Swann, notes on page 61 of Trademark

and Deceptive Advertising: Law, Science, and Design, 2012, American Bar Association:

> The Eveready format ... primarily addresses three confusion factors:
> similarity of marks, similarity of products, and commercial strength
> (expressed as top-of-mind awareness). Strength is the key: (i) if a schema
> is easily accessible in memory, it can be cued by a similar mark even
> where there is no similarity of products, and (ii) if a brand is dominant in
> the mind (COKE), its schema may be cued by another top-of-mind brand
> in the category (PEPSI), even when there is no similarity of marks. *If,
> however, the senior mark is not accessible, it obviously cannot be cued
> irrespective of mark and product similarity....* (Emphasis added.)

21.       That is to say, a brand cannot be cued (cannot come to mind in an Eveready

format) if it is not dominant.

22.       What constitutes brand dominance? According to Dictionary.com, the definition

of "dominance" is "rule" or "control," while Thesaurus.com gives us the closest synonyms of

"supremacy" and "rule." Thus, a reasonable definition of a dominant brand would be the leading

## CONFIDNTIAL - ATTORNEYS EYES ONLY

brand in a category such as COKE in the soft drink category or, perhaps, also a highly visible close competitor to the leading brand, such as PEPSI.

23.     Is RITTER a dominant brand in the categories of dental equipment, products and supplies? That is, is it the leading brand or a highly visible close competitor of the leading brand of dental equipment, products and supplies?

24.     According to the latest available industry and internal Midmark data, RITTER clearly is *not* a dominant brand in the dental market. In fact, in 2015 Midmark's sales of RITTER branded goods into the dental market ranked:

       * #4 out of 11 tabletop sterilizer brands (less than 1% market share)

       * #8 out of 13 operatory light brands (less than 2% market share)

       * #13 out of 14 dental chair brands (less than 1% market share)

See MID-001076 to MID-001078.

25.     Thus, across these categories, the RITTER brand was clearly a minor, as opposed to a dominant, presence in the dental market.  Midmark's RITTER brand clearly does not dominate the dental market as it only comprises less than two percent (2%) of the dental market for any of the three categories in which it competes with SPFM: dental products, specifically chairs, operatory lights, and tabletop sterilizers. (See MID-001076 to MID-001078).

26.     In order to test for likelihood of confusion with a non-dominant mark, the appropriate survey protocol is the line-up or Squirt protocol.  In a typical line-up survey testing for ordinary (i.e., forward) confusion, the junior user's products are shown to respondents, and then the senior user's products are shown in an array of similar products.  This line-up survey protocol is well accepted and frequently used in probative consumer survey research in those instances where the senior user's products do not dominate the market, such as the instant case.

7

CONFIDNTIAL - ATTORNEYS EYES ONLY

27.    Finally, I note that Mr. Klein states on page 2, paragraph 4 of the Klein Report that, contrary to fact, "None of the dental products sold by Midmark use the 'RITTER' name." Evidence of record clearly demonstrates that while Midmark's RITTER products are not dominant, some RITTER branded products are sold to dentists or otherwise into the dental market as reflected in ¶ 24, supra.  See also MID-001076 to MID-001078.

28.    Regardless, it is thus puzzling that Mr. Klein believes that the Eveready protocol, *designed for dominant brands*, would be an appropriate choice for RITTER particularly because he believes it to have no presence at all in the proper universe.  As noted, the Squirt protocol, which Klein did not follow, would be proper under these assumptions because it better represents a marketplace in which the litigated mark is not dominant.

## F.  OPINION

29    Based upon my skill, experience, and the analysis described above, I conclude that Mr. Klein's survey should be accorded no weight because he used an inappropriate survey protocol and accordingly asked the wrong questions, so that the answers to these wrong survey questions relied on by Mr. Klein have no probative value.

31.    Mr. Klein used the Eveready survey protocol and that was the inappropriate protocol for this case.  The Eveready survey protocol is improper for non-dominant brands such as Midmark's RITTER brand sold to dentists.

32.    The proper survey protocol for this case should be the Squirt or line-up protocol because it is appropriate for non-dominant brands, such as Midmark's RITTER brand, with less than two percent (2%) share of the dental market.

*********************

8

**CONFIDNTIAL - ATTORNEYS EYES ONLY**

33.     In preparing this Expert Rebuttal Report I relied upon reading Plaintiff's Complaint; Defendant's Proposed Answer and Amended Counterclaim; Plaintiff's Answer and Affirmative Defenses to Defendant's Amended Counterclaims; the Manual for Complex Litigation, Fourth Edition, 2004 prepared for the Federal Judicial Center; Trademark and Deceptive Advertising: Law, Science, and Design, 2012, various DTA dental industry sales reports, and Midmark internal sales data, MID-001076 to MID-001078.

I respectfully reserve the right to amend or supplement this declaration with further comments in the event that additional information becomes available.  Additionally, I may create exemplars and exhibits for use at trial consistent with my opinions.

I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.


_____                    April 14, 2016
Kenneth Hollander                                        Date

**CONFIDNTIAL - ATTORNEYS EYES ONLY**

APPENDIX A

**Kenneth Hollander**

Education
    Bachelor of Science, *The Ohio State University*

    MBA, The *University of Missouri*

Academic Involvement
    *University of Georgia Graduate School of Business*
- Lecturer
- Chairman, Board of Advisors, Masters of Marketing Research Program
- Distinguished Practitioner, Department of Marketing

    *Emory University Graduate School of Business*
- Lecturer

    *Stanford University Graduate School of Business*
- Lecturer

Publication
    Contributing Editor, Advertising, McGraw Hill

Speaker
    *American Marketing Association*
    *Association of National Advertisers*
    *Advertising Research Foundation*
    *Marketing Research Association*

Employment
Prior to starting *Kenneth Hollander Associates*:

a. Research Brand Manager, *The Procter & Gamble Company*, Research Brand Manager, Experimental Research and Technique Development, in which I was responsible for all unique, non-recurring research issues concerning all P&G brands.

b. Associate Research Director, *Hallmark Cards*, in which I was responsible for all non-greeting card research as well as acquisitions and mergers explorations.

c. Director of Research, *Young & Rubicam*, Chicago, in which I was responsible for all research for all of the agency's clients, including Allied Van Lines, American Paper Corporation, Armour Dial, International Harvester, and U.S. Naval Recruiting.

10

**CONFIDNTIAL - ATTORNEYS EYES ONLY**

d. Vice President, Director of Communications Planning Group, The *Interpublic Group of Companies*, in which I was responsible for all communications research for the Coca-Cola Company, both domestic and international.

<u>Testimony</u>

*American Optometric Society v. American Board of Optometry*, Case No. CV10-03983-AHM, U.S. District Court Central District of California

*Kimberly-Clark Corporation v. Cardinal Health 200*, Case No. 1:10-CV-0034-CAP, U.S. District Court Northern District of Georgia

*ThermoLife International v. Gaspari Nutrition*, Case No. 2-11-ev-01056-NVW, U.S. District Court District of Arizona

*Active Sports Lifestyle v. Old Navy*, Case No. SACV 8:12-0572 JVS (Ex), U.S. District Court Central Division of California

*QS Wholesale, Inc. v. Rox Volleyball, Inc.*, Case No. SACV 13-00512 AG (JPRx), U. S. District Court, Central District of California, Southern Division

*Amini Innovation v. McFerran Home Furnishings*, Case No. CV 13-06496 RSWL (SSx), U.S. District Court, Central District of California

*International IP Holdings v. Green Planet*, Case No. 2:13-cv-13988-RHC-PJK, U.S. District Court, Eastern District of Michigan

*Gibson Brands v. John Hornby Skewes & Co.*, Case No. CV-2:14-00609-DDSP-SS, U.S. District Court, Central District of California

*Farmer's Boy's Food, Inc. v. Farmburger*, LLC, Case No. 14-CV-01874-KAW, U.S. District Court, Northern District of California